IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



| | |
|---|---|
| JERRI JOETTE TILLETT, | CV 14-73-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER AND OPINION |
| BUREAU OF LAND MANAGEMENT; INTERIOR BOARD OF LAND APPEALS; and DEPARTMENT OF INTERIOR, | |
| Defendants. | |

## I. Introduction

Plaintiff Jerri Tillett brings this action for injunctive relief against the United States Department of Interior, Bureau of Land Management, and Interior Board of Land Appeals (collectively, "BLM"). Tillett challenges BLM's plan to use multi-year prescribed fires on approximately 6,200 acres in the northern part of the Pryor Mountain Wild Horse Range. (Doc. 1-1 at 4-5). These arguments are construed to allege that BLM's authorization of the plan violates the National Environmental Policy Act ("NEPA").[1]

---

[1] Although Tillett brought her claims under *Bivens* she clarifies that she merely checked what she thought was the most appropriate box listed on the Formal Complaint. Construing her pleadings liberally, this Court finds her claim may be construed as a challenge to final agency action under the Administrative Procedure Act.

1

BLM moves for summary judgment and asks the Court to uphold its Finding of No Significant Impact (FONSI) and dismiss Tillett's Complaint. (Doc. 28). The motion is fully briefed. (Docs. 29, 31, 34). Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court finds that oral argument would not significantly aid the decisional process, the Motion shall be decided on the record before this Court without a hearing.

## II. Background

The Pryor Mountain Wild Horse Range ("Horse Range") spreads over 38,000 acres in Montana and Wyoming. In addition to wild horses, the Horse Range is home to a number of different wildlife species, including migratory birds, several bat species, Rocky Mountain bighorn sheep, mule deer, black bears, and mountain lions, as well as various fauna and sensitive plant species.

As part of its management obligations of the Horse Range, BLM evaluated the range and issued a herd management area plan ("HMAP") in 2009, establishing an appropriate management level of horses, and setting out goals and objectives for successful management of resources in the Horse Range to "preserve and maintain a thriving natural ecological balance and multiple use relationships." (Doc. 26 at 818). During its evaluation, BLM found that certain areas of range were overused

due to grazing and drought. Using this information, BLM issued the 2009 Environmental Assessment for the Pryor Mountain Wild Horse Range Herd Management Plan ("the Plan"). (*Id.* at 818-0963). The Plan's purpose is to maintain a viable breeding wild horse population that perpetuates the characteristics of the Pryor Mountain horses, maintain the range in good condition, prevent further range deterioration, and improve range sites that are in bad condition. (*Id.* at 822). Overall, the Plan contemplates a larger wild horse population, development of wildlife waterers, noxious weed treatment, fence reconstruction, wildlife habitat enhancement, and range improvement through fuel reduction, riparian protection, and wildlife habitat enhancement. (*Id.* at 806).

Relevant to this case, the Plan also documents the need for prescribed fire to bring forest stands in the Horse Range within the natural range of viability for the existing forest types, and to maintain forest health, wildlife and wild horse habitat enhancement. (*Id.* at 846). Specifically, the Plan contemplates using prescribed fire over the years to "reduce the loss of existing habitat types to wildland fire. . . . [And to] increase the available forage for wild life and wild horses and increase available suitable big horn sheep habitat." (*Id.* at 900).

Consistent with the Plan, BLM issued the 2014 Pryor Mountain Wild Horse Range Prescribe Fire Environmental Assessment (2014 EA), to which Tillett objects, on March 7, 2014. (*Id.* at 15, 20). In the 2014 EA, BLM seeks to

3

implement the prescribed fire portion of the 2009 Plan over approximately 6,200 acres ("prescribed burn area") in the northern portion of the Horse Range. (*Id.*) BLM determined that buildup of hazardous fuels and poor forest health exposes the areas in and around the Horse Range to wildfire risk because "reduced fire frequency in the forested settings have caused a departure from the natural fire regime. . . . [and] [c]urrent forest stand structures, density levels, and species compositions elevate the risk of large scale/high intensity, high severity stand-replacing wildland fire." (*Id.* at 28-29).

From February to July 2013, BLM issued the Notice of Proposed Action to members on the Wilderness interest mailing list, the United States Forest Service, the Crow Tribe, the Northern Cheyenne Tribe, Montana Department of Fish, Wildlife and Parks, and the Montana State Historic Preservation Office. (*Id.* at 181-247). BLM released a preliminary version of the 2014 EA, FONSI and Decision Record (DR) adopting the Proposed Action and initiated a 30-day public comment period on September 25, 2013. (*Id.* at 73).

On September 13, 2013, BLM Billings Field Manager James Sparks sent a letter to various interested individuals advising them that the draft EA was available for a 30-day public review and comment period beginning September 23, 2013, and ending October 24, 2013. (*Id.* at 73-74). Sparks advised the letter recipients that they could find the draft EA on BLM's website. (*Id.* at 73) Tillett

was listed on the mailing list. (*Id.* at 126). On October 9, 2013, Tillett acknowledged receipt of Sparks' letter in her letter to BLM acting director, Katherine Kitchell. (*Id.* at 128). Tillett thanked Kitchell for the notice and submitted her official comments on the 2014 EA. (*Id.*) She explained her difficulty in obtaining an EA and requested that BLM extend the comment period. (*Id.*) She also stated that she had been steadfastly opposed to prescribed fires on the Horse Range for over a decade. (*Id.* at 128-29).

On November 1, 2013, BLM staff and managers met with several individuals representing various groups and interests to answer questions regarding the preliminary EA. (*Id.* at 128-29) BLM extended the comment period to November 4, 2013. (*Id.* at 1) Sparks sent out another letter on March 7, 2014, enclosing the final EA/FONSI and DR. (*Id.* at 1, 68) Tillett was listed on that mailing list as well. (*Id.*)

On March 7, 2014, BLM issued the Fire EA, FONSI and DR to implement prescribed burning in the northern part of the Horse Range. (*Id.* at 1-67). Tillett filed her Complaint and Motion for Preliminary Injunction on June 9, 2014, to stay the prescribed fires on the Horse Range. (Doc. 1, 2). Tillett objects to the 2014 EA on several grounds. (Doc. 1-1 at 4-5).

## III. Procedural Framework

### A. NEPA standard of review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action affecting the environment. *See Cal. Ex. rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going forward." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002). NEPA requires an agency proposing a major federal action significantly impacting the environment to prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives. 42 U.S.C. § 4332(C). To determine whether an EIS is required, the agency typically first prepares an EA. 40 C.F.R. § 1501.4(b). An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a), (b); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701–706. 5 U.S.C. § 706(2)(A). Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Courts may resolve APA challenges via summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## B.  Judicial Review under the Administrative Procedure Act

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise, and

presumes the agency action to be valid. *Arkansas v. Oklahoma*, 503 U.S. 91, 112 (1992). The agency, however, must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002). Thus, the court must look at whether the decision considered all of the relevant factors or whether the decision was a clear error of judgment. *Id.* Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its] review is at an end." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

## IV. Discussion

### A. NEPA claims

#### 1. BLM provided adequate notice and allowed sufficient opportunity for public comment.

Tillett argues that BLM's first NEPA violation was failing to notify her of the proposed EA on the prescribed burns. (Doc. 31 at 4). NEPA requires the agency to "involve environmental agencies, applicants, and the public, to the extent practicable" in the preparation of the EA. *See* 40 C.F.R. § 1501.4(b). The Ninth Circuit has interpreted this requirement to mean that "a sufficient amount of environmental information – as much as is practicable – be provided so that a member of the public can weigh in on the significant decisions the agency will

make in preparing the EA." *Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng.*, 524 F.3d 938, 953 (9th Cir. 2008).

"Circulation of a draft EA is not required in every case," *Bering Strait*, 524 F.3d at 953. Nonetheless, BLM made the draft 2014 EA available on its website, (doc. 26 at 73), and notified over 100 individuals via letter that the draft 2014 EA was available for review. (*Id.* at 123-127). BLM requested comments on several occasions, provided a formal comment period, extended that formal comment period upon the public's request, and held a meeting on November 1, 2013, receiving additional comments from the public. (*Id.* at 1). The Court finds the "quality of the BLM's dissemination of environmental information to the public and its consideration of public comment, before issuing its EA, was reasonable and adequate[.]" *Bering Strait*, 524 F.3d at 953. BLM's public meeting on November 4, 2013, also satisfied the requirement to provide adequate information "through public meetings or by a reasonably thorough scoping notice." *Id* at 952.

Additionally, the record belies Tillett's argument that she did not receive notice from BLM about the proposed EA. In her October 9, 2013 letter to Kitchell, Tillett acknowledged receiving Sparks' letter notifying the public of the proposed EA and comment period. (Doc. 26 at 128). Also in her October 9, 2013, letter, Tillett provided her comments on the draft EA, (*id.* at 128-131), and thus participated in the comment period like many others. (*Id.* at 131-178). Finally,

BLM extended the comment period on the draft 2014 EA as Tillett specifically requested in her letter. (*Id.* at 1). Thus, the record demonstrates that even if Tillett did not know about the draft 2014 EA until October 9, 2013, she had over a month to submit her comments in light of the extension, which was the same period available to submit comments prior to the extension. In other words, Tillett had sufficient time and knowledge to inform BLM's decision-making process.

Based on the number and content of the public comments BLM received on the draft EA and the plans contained therein, this Court finds that the public, including Tillett, was "provided with sufficient environmental information, considering the totality of the circumstances, to permit [them] to weigh in with their views and thus inform the agency decision-making process." *Bering Strait*, 524 F.3d at 953. BLM diligently involved the public in preparing and implementing the NEPA procedures. *See* 40 C.F.R. § 1506.6(a).

### 2. Sensitive species

Next, Tillett argues that BLM violated NEPA because it failed to adequately analyze and consider the adverse impacts that the 2014 EA will have on the sensitive plant species and migratory birds[2] in the prescribed burn area. (Doc. 31

---

[2] Although Tillett characterizes her complaints about the effects of the prescribed burns on migratory birds as violations of the Migratory Bird Treaty Act (doc. 34 at 5), it is clear from her argument that she objects to the impacts of the plan described in the EA on the birds and their habitat. Accordingly, because she is a pro se litigant, the Court affords her the benefit of the doubt and construes her

at 6; 31-3 at 7) She argues that BLM has an obligation to protect these sensitive species through specific management actions. (Doc. 31 at 6; Doc. 3-2 at 4). Tillett cites to BLM's 2013 Billings and Pompeys Pillar National Monument Resource Management Plan and Environmental Impact Statement, which notwithstanding its lack of applicability to the 2014 EA, provides the court with the information that a "sensitive species" designation requires BLM to pay "particular management attention due to population or habitat concerns," and that "[c]onsultation is required on any action that a federal agency proposes that (1) may adversely impact a federally listed species, or (2) will result in jeopardy or adverse modification of critical habitats." (Doc. 31-2 at 3.7.3.3).[3] Tillett points out that BLM provided little to no support regarding the impact of the prescribed burns on the sensitive species in the prescribed burn area. (Doc. 3 at 6).

In response, BLM agrees that sensitive species exist in the particular project areas but contends that the EA considered the effects of the project on the migratory birds. (Doc. 34 at 10). BLM argues that mitigation measures in the EA provide that an inventory for sensitive species will occur before the burns and that

---

argument as an alleged NEPA violation rather than a Migratory Bird Treaty Act violation. *See Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir. 1988).

[3] The Court recognizes that BLM did not tier the 2014 Fire EA to the 2013 EIS referenced by Tillett. Nevertheless, BLM is still bound by the obligations and categorizations contained therein.

11

only one sensitive migratory bird species, the Clark's Nutcracker, exists in the area. In other words, BLM argues the EA is adequate because it acknowledges that a sensitive species lives in the burn area and it contemplates that the BLM will count the birds before the burn. Further, BLM points out that the sensitive plant at issue, Lesica's Bladderpod, is not found within the burn area. (*Id.*)

Because Lesica's Bladderpod is not found within the prescribed burn area, the Court need delve no further on that issue. Because BLM admitted that the Clark's Nutcracker, a sensitive species, was located in the prescribed burn area, however, the 2014 EA must contain a "convincing statement of reasons explaining why impact of the prescribed burns [on that species] was insignificant." *See LaFlamme v. F.E.R.C.*, 852 F.2d 389, 401 (9th Cir. 1988) ("An agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. . . it must supply a convincing statement of reasons why potential effects are insignificant.") The 2014 EA does not supply such a statement.

BLM failed to analyze how, if at all, the prescribed burns will affect the Clark's Nutcracker. The EA generally states that by reducing the potential for high intensity stand replacing wildfires, the project benefits wildlife, including the birds, (doc. 26 at 11), but nowhere in the EA does BLM discuss any adverse impacts to the Clark's Nutcracker. BLM simply noted the presence of the Clark's Nutcracker

in or near the project area, (*id.* at 56), assessed that the species was very common throughout "the project area," (*id.*), and then stated "birds of all species have adapted to habitats that are dynamic, regularly changing and restored by wildfire." (*Id.* at 57). But "[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Conservation Cong. v. Finley*, 774 F.3d 611, 621 (9th Cir. 2014). Likewise, simply stating that all birds can fly out of the area does not constitute taking a "hard look" at the environmental impacts.

BLM also failed to consider how the prescribed burns will affect the Clark's Nutcracker's habitat. Although the EA states that the Clark's Nutcracker is found within the burn area and the "middle to upper" areas of the range, the EA does not state how much of the bird's habitat will remain during and after the burns. In summary, BLM devotes two sentences in the EA to the Clark's Nutcracker, neither of which analyzes the environmental impacts of the burn on the sensitive species.[4]

NEPA requires agencies to ensure professional and scientific integrity, by setting forth the methodologies used and making "explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir. 2006),

---

[4] Noting that the 2014 EA is tiered to the 2009 HMAP/EA, the Court looked there for further supporting discussion on the Clark's Nutcracker. The 2009 EA does not discuss the Clark's Nutcracker at all.

abrogated on other grounds by *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (citing 40 C.F.R. § 1502.24).[5] It does not make sense to give the Clark's Nutcracker a "sensitive species" designation and then treat the bird the same as other migratory birds without that designation. Moreover, it does not comport with BLM's obligation to give sensitive species particular management consideration. (Doc. 31-2 at 3.7.3.3). In its discussion regarding the prescribed burns on the sensitive species in the prescribed burn area, BLM not only failed to set forth any methodologies used in its FONSI, it failed to analyze the issue at all. In short, it completely failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The Court concludes that more is required under NEPA in order for BLM to conclude that no significant impacts on the sensitive species in the area will result from the prescribed burns contemplated in the 2014 EA. BLM's motion for summary judgment on this issue is denied.

---

[5] Although NEPA regulations impose this requirement explicitly on an EIS, this Court, like many others, finds that it applies to a Final EA. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir.2012) (where defendants did not dispute this requirement applied to the EA, court considered whether it had been met); *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F. Supp. 2d 957, 974 (E.D. Cal. 2013), appeal dismissed (July 21, 2014) (BLM is required to set forth the methodologies it uses and references it relies upon for the conclusions it makes in the final EA).

14

### d. Soil Erosion and Pesticides

Tillett argues that BLM did not adequately analyze the effects the prescribed burns will have on the landscape within the prescribed burn area. Specifically, Tillett contends that post-burn, the charred landscape will be more susceptible to the elements, resulting in greater erosion and more noxious weeds, which will in turn, require more pesticide applications. (Doc. 31 at 16). BLM argues that many of the mitigation measures included in the 2014 EA address soil erosion and minimize the establishment of noxious weeds. (Doc. 34 at 12).

The record demonstrates that BLM took the requisite 'hard look' at soil erosion and pesticide use. The 2014 EA includes a broad range of mitigation tactics to minimize erosion and the need for pesticides. (Doc. 24 at 20-22, 25-25). It also discusses significant efforts to prevent noxious weed introduction during the prescribed burns, including washing all equipment before entering the area, detecting and eradicating new noxious weed establishment and minimizing soil disturbance. (*Id.* at 53). The 2014 EA indicates that these efforts reduce the need for pesticides. (*Id.*) In the event pesticides are required, only those pesticides previously vetted through the prior Vegetation Treatment EIS conducted in 2007 will be used. (*Id.* at 4). The analysis reflected in the record on this issue is sufficient to satisfy the Court that BLM's decision was not arbitrary and capricious.

### e. Wilderness Study Areas and Wilderness Characteristics

Tillett next asserts that the 2014 EA failed to consider how the prescribed burns will affect the wilderness characteristics and Wilderness Study Areas of the Pryor Mountain Area. (Doc. 31 at 12-13). BLM asserts it took a hard look at the impacts on the wilderness characteristics in the area. (Doc. 34 at 14).

"Among the resources to be managed on federal lands, lands with statutorily defined wilderness characteristics are of particular importance." *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1097 (9th Cir. 2010). Congress passed the Wilderness Act in 1964 with the express purpose of "assur[ing] that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a).

The Federal Land Planning Management Act ("FLPMA") interacts with the Wilderness Act to provide BLM with broad authority to manage areas with wilderness characteristics contained in the federally owned land parcels BLM oversees, including by recommending these areas for permanent congressional protection. *Oregon Natural Desert Ass'n*, 625 F.3d at 1097. "[T]he FLPMA makes clear that wilderness characteristics are among the values which the BLM can address in its land use plans, and hence, needs to address in the NEPA analysis

for a land use plan governing areas which may have wilderness values." *Id.* at 1112.

Relevant to the situation at hand, in 1991, the Secretary of the Interior issued the Wilderness Study Areas (WSA) Record of Decision (RD) for the Pryor Range. (Doc. 24 at 42). This document finalized BLM's recommendation to Congress and adjusted the original BLM recommendations for the Pryor Mountains WSA by recommending the inclusion of 12,575 acres and adjusting boundaries and the Bighorn Tack-on WSA by recommending the inclusion of 2,470 acres and adjusting the boundary. (*Id*). The 2014 EA prescribed burn areas overlap with portions of the WSAs and lands with wilderness characteristics designated in the RD. (*Id.* at 42, 48).

While Tillett is correct that the burns are set to occur on portions of the WSA and lands with wilderness characteristics, her arguments with respect to this issue are vague and non-specific. (*See* Doc. 34 at 12-13). A review of the record convinces this Court that BLM took the requisite hard look at the effects of the prescribed burns on the WSAs and wilderness characteristics in the area. While Tillett seems to generally take issue with prescribed fires occurring in the WSAs, BLM specifically contemplated using prescribed fire in its Management of WSAs Manual as a tool to make conditions possible for natural fire to return to the WSAs. (*Id.* at 46).

17

Notably, BLM acknowledges that the lands with wilderness characteristics are "essentially extensions" of the WSAs and taken together, provide extensive and expansive opportunities for primitive recreation opportunities. (*Id.* at 48). Using minimal ground treatments and small fires, the 2014 EA contemplates minimal impact on the wilderness characteristics. Considering fire is a wilderness characteristic in and of itself, this Court finds that BLM's analysis on this issue contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," of the prescribed burns on the WSAs and wilderness characteristics of the area. *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir.1997) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992)).

## V. Conclusion

In sum, the Court finds that BLM complied with all but one of its NEPA obligations: the requirement to take a hard look when it considered the impacts of the prescribed burns on sensitive species in the area, in particular the Clark's Nutcracker. Accordingly, IT IS HEREBY ORDERED that:

BLM's Motion for Summary Judgment (doc. 28) is GRANTED IN PART AND DENIED IN PART. It is further ordered that BLM's decisions regarding impacts on special status species, in the Environmental Assessment are

18

VACATED and the matter is REMANDED to the BLM for further proceedings consistent with this opinion and this case is hereby closed.

DATED this 27th day of August 2015.

*Susan P. Watters*
SUSAN P. WATTERS
U.S. DISTRICT COURT JUDGE